# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1526 | **DATE** | 12/1/2003 |
| **CASE TITLE** | | Elizabeth Czerska vs. United Airlines, Inc. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐   Filed motion of [ use listing in "Motion" box above.]

(2)  ☐   Brief in support of motion due _____.

(3)  ☐   Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐   Trial[set for/re-set for] on _____ at _____.

(8)  ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■   [Other docket entry]   Defendant's motion for summary judgment [25-1] is reinstated because the Bankruptcy Court has entered an order lifting the stay.  Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [25-1] is granted on all four counts of Plaintiff's complaint and judgment is therefore entered in favor of Defendant, United Airlines, Inc., and against Plaintiff, Elizabeth Czerska, on Plaintiff's complaint.

(11) ■   [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. |
|---|---|
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

DK  courtroom deputy's initials

Date/time received in central Clerk's Office

number of notices

DEC 02 2003
date docketed

docketing deputy initials

12/2/2003
date mailed notice

DK
mailing deputy initials

Document Number

U.S. DISTRICT COURT
CLERK
03 DEC -2 AM 3: 59

10 ED-03 0T

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ELIZABETH CZERSKA,                )
                                  )
    Plaintiff,                 )
                                  )
                                  )
    v.                         )    **Case No. 01 C 1526**
                                  )
                                  )    **Magistrate Judge Morton Denlow**
UNITED AIRLINES, INC.,            )
                                  )
    Defendant.                 )

DOCKETED
DEC - 2 2003

~ ~~~~TED
'. 2003

## MEMORANDUM OPINION AND ORDER

Elizabeth Czerska ("Czerska" or "Plaintiff") filed a four count complaint alleging sex discrimination, retaliation, breach of contract, and promissory estoppel. The case is now before the Court on United Airlines's ("United" or "Defendant") motion for summary judgment on all four counts. For the reasons stated herein, Defendant's motion for summary judgment is granted.

## I. FACTUAL BACKGROUND

The following facts are undisputed unless noted. United employed Czerska in the Corporate Real Estate Department ("Department") from October 10, 1988, to August 15, 2000. DR ¶ 1.[1] Plaintiff's indirect supervisor from 1992 to 1996 was Gary Lantner

---

[1] Citations to the record are in the following form: Plaintiff's Response to Defendant's 56.1(a) Statement of Material Facts is cited as PR ¶ ___; Defendant's Response to Plaintiff's 56.1(b) Statement of Additional Facts is cited as DR ¶ ___; Plaintiff's Memorandum of Law in Opposition to Summary Judgment is cited as Pl. Mem. at ___; Plaintiff's Complaint is cited as

("Lantner"). DR ¶ 6. In 1996, Czerska filed a sex discrimination complaint with the human resources department against Lantner. DR ¶¶ 7, 8. Joan Czerneda, Senior Staff Specialist in Human Resources, completed an investigation and determined that Lantner was abusive to both men and women and his motives were not discriminatory. DR ¶ 10.

## A. PLAINTIFF'S PROMOTION TO MANAGER OF INTERNATIONAL PROPERTIES AND FACILITIES

In February 1997, Czerska was promoted to the position of Regional Manager of International Properties and Facilities. DR ¶ 20. This position included managing United's properties in Europe. *Id.* In connection with this promotion, Czerska was permitted to transfer her residence to Europe and work from an office in her home. DR ¶ 46. Czerska negotiated this promotion with the head of the Department at that time, Larry Clark ("Clark"), an officer of United. DR ¶¶ 5, 22. Some of the terms of this promotion agreement were reduced to writing and signed by both Clark and Czerska. DR ¶ 23; Pl. App. Ex. 7. The writing was in the form of a letter agreement dated May 2, 1997. Pl. App. Ex. 7. The letter began by stating its purpose and that "nothing in this agreement alters your [Czerska's] status as an at-will employee." *Id.* It further indicated Czerska's new base salary of $5,442.00 per month, the amount of her lump sum reimbursement for relocation, her new title of Regional Manager, her new host location of Brussels, Belgium, and the benefits she would

---

Compl. at ___; Plaintiff's Appendix in Support of Her Opposition to Summary Judgment is cited as Pl. App. Ex. ___; the Appendix to Defendant's 56.1(a) Statement of Material Facts is cited as Def. App. Ex. ___.

receive. *Id.* The letter also indicated Czerska's responsibility for payment and preparation

of taxes and her responsibility for obtaining work permits. *Id.* Lastly, the letter contained

a release of any prior discrimination claims and a statement of confidentiality. *Id.*

Czerska presents evidence that, in addition to the written agreement regarding her

promotion, Clark made an oral promise that Czerska's relocation to Belgium was permanent.

DR ¶ 24. United denies that such an oral representation was made. *Id.* United admits that

Czerska's assignment was permanent to the extent that it was not a "temporary assignment

for a fixed period of time." *Id.*

## B. DECISION TO ELIMINATE PLAINTIFF'S POSITION IN BELGIUM

From 1992 until January 2000, Lantner was the Director of Facilities and Planning.

DR ¶ 4. Lantner reported directly to Larry Clark from 1994 to June 1999. DR ¶ 5.

In June 1999, Amos Kazzaz ("Kazzaz"), an officer of United, replaced Clark as head

of the Department. DR ¶ 29. Lantner was promoted to Director of Real Estate on January

2, 2000, and reported directly to Amos Kazzaz from June 1999 until the time of this

litigation. DR ¶¶ 3, 30.

During his first six months as the head of the Department, Kazzaz evaluated the

Department. DR ¶¶ 32-33. He spoke with Czerska several times during this period. DR ¶

34. In November 1999, Kazzaz met with Czerska in Germany, at which time they discussed

Czerska's expense reports, and Kazzaz stated that he would help Czerska obtain a low cost

phone line to reduce expenses. DR ¶¶ 42-44.

In late 1999, Czerska gave John Reedy ("Reedy"), the Manager of Business Administration for the Department, PR ¶ 8, budget information over the phone, DR ¶ 51. Reedy became angry and hung up on Czerska after she indicated that she did not have the information he needed. DR ¶ 51; PR ¶ 110. Czerska reported this incident to Kazzaz as sex discrimination. DR ¶ 52. After discussing this complaint with Kazzaz, Czerska changed her complaint to exclude a sex discrimination allegation; the facts regarding her decision are disputed. PR ¶¶ 110-14.

In January 2000, Kazzaz reorganized the Department, placing Czerska back under the supervision of Lantner. DR ¶ 39. Soon thereafter, Kazzaz determined that Czerska's position in Europe would be eliminated. PR ¶ 41. That spring, Czerska had several informal discussions with senior employees in the Department about the possible elimination of her position in Europe. DR ¶ 88; PR ¶¶ 42-45.

In a letter dated April 28, 2000, Kazzaz officially informed Czerska that her position in Europe was being eliminated effective July 1, 2000. PR ¶ 46. Kazzaz outlined three options from which Czerska could choose: 1) return to the United States and work on projects at the world headquarters in Chicago while maintaining the same title and pay; 2) seek other employment with United; or 3) accept fourteen weeks of severance pay. *Id.* At the time, United had an increase in the number of Chicago-based projects, and Kazzaz thought Czerska's project management skills would be an asset to the large-scale projects in Chicago. PR ¶¶ 41, 46. Czerska sent an email to Kazzaz dated May 1, 2000, reminding him

4

that her 1997 relocation included an oral promise that she was to have permanent residence in Brussels, Belgium. DR ¶ 100. Kazzaz responded to her email via a letter also dated May 1, 2000. DR ¶ 102. Kazzaz's letter stated in part:

> 3. You are correct about your previous promotion and relocation; however, this office is being closed, and your position must be modified accordingly. United is offering relocation to Chicago according to the current relocation policy applicable to your current grade.

DR ¶ 103. Czerska ultimately decided to return to Chicago. PR ¶ 48. All of Czerska's new duties were located at O'Hare in Chicago. PR ¶ 50.

## C. CZERSKA'S RETURN TO CHICAGO

In connection with Czerska's return to Chicago, she attempted to negotiate a better relocation package than the one offered by United. PR ¶ 55. She employed a lawyer, Les Klein, to help her "communicate" with United. *Id.* Czerska believed that male employees in the department were given more favorable relocation benefits. DR ¶¶ 109-10. Whether she clearly communicated this complaint to Kazzaz is disputed. DR ¶ 109. United contends that Czerska sought an "ex pat" package for relocation and that it refused to give her the package, which is provided to employees who are going to a foreign location for a limited period of time with the intent of returning to their home country. PR ¶¶ 55-56. Plaintiff does not agree. DR ¶ 55. In any event, United refused to extend her a package better than the one it originally offered. PR ¶ 57.

United had offered Czerska an upgraded relocation package for homeowners, despite the fact that she did not own a home in Belgium. PR ¶ 53. Plaintiff's relocation benefits included a lump sum payment of $6,000, one month's salary for miscellaneous expenses, round trip tickets for house hunting, reimbursement for a split shipment of household items, the packing and unpacking of her belongings, and a $10,000 relocation bonus. PR ¶ 57.

## D. REVIEW OF CZERSKA'S EXPENSE REPORTS

In early 2000, Lantner directed Reedy to review Plaintiff's business expenses for which she sought reimbursement. DR ¶ 61. Linda Reid helped Reedy with the review. PR ¶ 85. Whether Kazzaz knew of this review is disputed. DR ¶ 61; PR ¶ 85. In February 2000 Reid informed Kazzaz and Lantner in writing that an adjustment had been made to Czerska's expense report. DR ¶ 63. In addition, Reid prepared a handwritten note to Lantner about the review of Czerska's expenses which included multiple pages of the expense reports. DR ¶ 66. Reid also sent items relating to Czerska's February expense report to Kazzaz. DR ¶ 70. In March 2000, Reedy informed Lantner of the results of the expense report investigation via an email indicating an examination of Czerska's expense reports for the prior full year. DR ¶ 76. The email referred to Czerska as "our favorite subject in Brussels." *Id.* Around the same time, Czerska's AT&T calling card was canceled and certain calls were deducted from her expense report. DR ¶ 84.

## E.    EVENTS LEADING TO CZERSKA'S TERMINATION

Czerska incurred numerous expenses in connection with her relocation. DR ¶ 127. She included some of those expenses in her business expense report seeking reimbursement. *Id.* In August 2000, Czerska and Kazzaz had a dispute over those expenses. PR ¶¶ 59-74, 76; DR ¶¶ 118-22, 127-50. Czerska submitted an expense report on July 14, 2000, requesting reimbursement for $885.73 in telephone calls. PR ¶ 59. She included calls to Les Klein, an attorney she retained to "communicate" with United about her relocation package. PR ¶ 65.

The approval process for expense reports required Plaintiff to submit her prepared report to her supervisor for approval; her supervisor would sign it and send it to the audit department for a compliance audit. DR ¶ 112. Depending on the size of the reimbursement request, the report may be forwarded to Kazzaz for approval. *Id.* Thomas Brown, Czerska's immediate supervisor, signed her July 14 expense report. DR ¶ 117. Kazzaz received the expense report on or after July 24, 2000, and he was drawn to the size of the phone bill. DR ¶¶ 118-19. No one from the audit department had approved a compliance audit. DR ¶ 120.

Czerska met with Kazzaz on August 3, 2000. PR ¶ 63. At the meeting, Kazzaz mentioned the report and asked Czerska to review it. *Id.* After that meeting, Czerska deleted calls from her hotel bill and three calls from her telephone bill. PR ¶ 64. She later returned the report to Kazzaz with a memo stating:

On the attached phone bill from Brussels there are numbers that may look unfamiliar to you. They are connected with my move to USA [sic]. There are some phone calls to my real estate agent, mortgage provider, insurance agent and layer [sic] who were helping me to wrap up the deal for my new home in Chicago.

There are some calls to my sister with whom I stayed few [sic] times (have not used hotel) while on business in Chicago and she has also assisted me in house hunting task [sic].

I would appreciate greatly if these charges could be categorized as business related calls.

*Id.*; Pl. App. Ex. 32. Czerska does not remember whether she deleted the phone calls to Les Klein. PR ¶ 65.

Kazzaz returned the report to Czerska on August 4, along with a memorandum asking her to identify the business purpose for each call. PR ¶ 66. On August 7, Czerska returned the report to Kazzaz, having coded each phone call as "B" for business, "D" for doctor, "RE" for real estate, "S" for sister, and "L" for lawyer. PR ¶ 67. Kazzaz forwarded the bill to Reedy for review. *Id.* Reedy indicated that some of the calls were not consistent with the codes Czerska had provided. *Id.*

On August 10, Czerska and Kazzaz met to discuss the expense report. PR ¶ 68. Kazzaz asked Czerska about each call on her expense report, and he took notes of their conversation in the margin of the report. *Id.* During this meeting, Czerska indicated to Kazzaz that the calls marked "L" were calls to Les Klein, who helped Czerska with United's relocation package. *Id.* Kazzaz indicated that he was concerned about the entries and that calls to Les Klein were personal calls and should not be included on her expense report. PR

¶ 69. United alleges that Czerska told Kazzaz that she would not remove the calls to Les Klein unless Kazzaz indicated in writing that she was required to do so. PR ¶ 70. Czerska denies that she made such a request. *Id.* Her deposition, however, supports United's assertion:

> Q: What else was said during the conversation with Kazzaz on August 10[th]?
>
> A: He says, "Elizabeth, you have to realize that those are not business calls."
> And I said, "If you want me to take them off, give me that in writing."

*Id.*

Czerska also indicates that she was confused by Kazzaz's failure to reimburse her for the expenses because he had never explained that the calls made for the purpose of her relocation to the United States were not reimbursable. *Id.* Additionally, Czerska believed that Kazzaz was manipulating the events in order to make it appear as though she had done something wrong. PR ¶¶ 70, 72.

United asserts that Kazzaz genuinely thought Czerska was misrepresenting her business expenses at this time and that he began to consider terminating Czerska. PR ¶ 70. Additionally, United asserts that $107.42 in phone calls for which Czerska sought reimbursement were personal calls. PR ¶ 73. Czerska denies that any of these were personal calls and states that she informed Kazzaz in her memo that these were expenses related to her relocation, which she hoped Kazzaz would characterize as business expenses. *Id.*

While Czerska and Kazzaz were discussing her July expense report, Czerska submitted another expense report to Thomas Brown on August 7, 2000. PR ¶¶ 74-75. The

report requested reimbursement for hotel, meal, and rental car expenses incurred on July 30 and 31. *Id.* Brown communicated to Czerska that United would not reimburse her for the hotel, meal, and car expenses because they were covered in her lump sum payment. PR ¶ 75.

On August 15, 2000, Kazzaz informed Czerska via letter that she was terminated from employment. PR ¶ 76. Kazzaz's letter indicated in part that:

> [t]hroughout this expense review process you presented a defiant and belligerent attitude. In addition, you misrepresented the purpose of several calls in an attempt to be reimbursed for them. . . . [Y]ou were counseled on more than one occasion about United's policy with respect to reimbursement of phone expenses and were warned not to continue to submit expense reports seeking reimbursement for personal calls.

*Id.*

## F.     UNITED'S TREATMENT OF MALE EMPLOYEES IN THE DEPARTMENT

Czerska alleges that several males in the department were treated more favorably than she. DR ¶¶ 154, 157-62. Some male employees were given the opportunity to work out of home offices and travel to the world headquarters in Chicago when needed. DR ¶¶ 157, 161. Other employees were permitted to live in one location and perform job duties in another location. DR ¶ 162. For instance, Max White, Demetrio Garcia, and Gerald Taylor were permitted to live in one location and perform job duties in another. *Id.* In particular, Max White lived in the United States and performed duties in the Atlantic division in Europe. United pointed out during the oral argument that White had some duties in the Atlantic division but was also responsible for duties in the Star Alliance which involved work in the

Chicago office and overseeing Star Alliance programs in Europe. In addition, his European job duties did not involve daily commuting to Europe.

Czerska also indicates that Mike Mathews, Sing Chang, Pete Dial, Jay Dayhoff, and Gary Lantner were permitted to work from home offices and travel to the headquarters in Chicago, if needed. DR ¶¶ 157-61. Finally, Czerska asserts that Gerald Taylor was given a better relocation package than Czerksa when he relocated to Tokyo for a temporary assignment. DR ¶¶ 154-55. United admits that some employees had offices in their homes and that Lantner has an office in his home and travels to Chicago approximately twice per month. DR ¶¶ 157-60. United also admits that Matthews, Chang, Dial, and Dayhoff travel to the Chicago headquarters, but indicates that none of these employees' regular duties focus on Chicago-based projects. DR ¶ 161. United denies that it pays for male employees at Czerska's level to live in one location or area and commute to work in an international location on a daily basis. DR ¶ 162.

## G.    THE LITIGATION

Following her termination, Czerska filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") against United. Compl. ¶ 5. She received a "Notice of Right to Sue" letter on December 27, 2000, and filed this lawsuit within ninety days. Compl. ¶ 6. Her complaint alleges four counts against United. The first, sex discrimination, alleges that United discriminated against Czerska based on her sex when it failed to give her the same compensation and benefits it gave similarly situated male

employees, and failed to give her the same relocation benefits when it forced her to return to the United States. Compl. ¶ 12. The second count, retaliation, alleges that United retaliated against Czerska after she complained of sex discrimination by failing to provide her with the same compensation and benefits provided to similarly situated male employees, by failing to provide her with relocation benefits provided to similarly situated male employees, and by terminating her for conduct in which male employees have engaged but for which they were not terminated. Compl. ¶ 21. The third count, breach of contract, alleges that in 1997 United promised Czerska that she could reside in Belgium permanently and that Czerska's agreement fell under United's applicable policies and benefits package (i.e., the "ex pat" package). Compl. ¶¶ 28-29, 33. Czerska alleges that United breached this contract by forcing her to return to the Chicago office and by not giving her the "ex pat" package for her relocation. Compl. ¶ 34. The final claim, promissory estoppel, alleges that United made an unambiguous promise on several occasions to allow Czerska to reside in Belgium permanently. She allegedly relied on that promise by moving to Belgium, and she allegedly suffered damages as a result. Compl. ¶¶ 39-42. Currently before the Court is United's motion for summary judgment on all four counts. Each will be discussed in turn.

## H.    UNITED'S BANKRUPTCY

After United filed its motion for summary judgment in this case, United filed for bankruptcy. The bankruptcy court subsequently ordered a stay on all judgments affecting United, including this one. On November 21, 2003, the bankruptcy court modified the stay

for the sole and exclusive purpose of enabling this Court to issue this opinion and enter any resulting orders.

## II. DISCUSSION

A court may grant summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence is viewed in the light most favorable to the non-movant and "all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). However, the party bearing the burden of proof on an issue at trial may not rest on the pleadings but rather must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)). The summary judgment standard is applied with scrutiny in employment discrimination cases, which often rely on issues of intent and credibility. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491 (7th Cir. 2000).

### A.   SEX DISCRIMINATION

Title VII prohibits discrimination in the employment context by prohibiting the consideration of sex in making hiring, discharge, and other employment decisions. 42 U.S.C. § 2000e-2. Title VII provides:

> It shall be an unlawful employment practice for an employer --
>    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

A plaintiff may prove employment discrimination by using either the direct method or the indirect method also known as the burden shifting *McDonnell Douglas* approach. *Bellaver*, 200 F.3d at 492-94. The direct approach uses direct or circumstantial evidence to show that the defendant acted with discriminatory motivation. *Id.* at 492. "Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000).

If a plaintiff chooses to use the *McDonnell Douglas* burden shifting method, she must first establish a *prima facie* case of discrimination. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326-27 (7th Cir. 2002). The *prima facie* case includes a showing of all four elements: 1) she is a member of a protected class; 2) at the time of the termination, she was meeting the employer's legitimate expectations; 3) in spite of meeting the legitimate expectations, she suffered adverse employment action; and 4) she was treated less favorably than similarly situated employees outside of the protected class. *Id.* at 326. After the plaintiff presents a *prima facie* case of discrimination, the employer must give valid nondiscriminatory reasons for the adverse employment action; the plaintiff then has the opportunity to rebut the nondiscriminatory explanation with sufficient evidence that the employer's explanation is

pretextual. *Id.* "[P]retext means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). If Plaintiff Czerska presents enough evidence to raise a genuine issue of material fact concerning the critical issue of whether male employees were treated more favorably than Plaintiff, she survives summary judgment. *See Bellaver*, 200 F.3d at 495.

In this case, Plaintiff presents no direct evidence of discrimination. Plaintiff's argument centers on the disparity in treatment between her and allegedly similarly situated male employees. Plaintiff focuses on two actions by Defendant: 1) Defendant's failure to provide Plaintiff with compensation and benefits comparable to male employees who worked outside of the United States; and 2) Defendant's failure to provide Plaintiff with compensation and benefits comparable to male employees when she returned to the United States.[2] This Court will analyze the facts under the *McDonnell Douglas* burden shifting framework.

At this stage, there is no dispute over whether Plaintiff meets the first three elements of the *prima facie* case. Defendant argues that Plaintiff can not meet the last element because she can point to no similarly situated employees. In addition, Defendant argues that even if Plaintiff can establish a *prima facie* case, she can not show any facts indicating that Defendant's legitimate nondiscriminatory explanation is pretextual.

---

[2] Plaintiff's Complaint included a third claim that Defendant terminated her employment because of her gender, but she has decided not to pursue this claim. PR ¶ 95.

First, Defendant argues that Plaintiff can not show that she was treated less favorably than any similarly situated male employees. A similarly situated employee is one who is "directly comparable to [the plaintiff] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Although the relevant factors may vary depending on the case, a court should consider factors such as whether the plaintiff and the purportedly similarly situated employees had the same supervisor and were subject to the same standards. *Id.* A plaintiff need not be completely comparable but rather must be substantially similar to the more favorably treated employees. *Radue*, 219 F.3d at 618. Furthermore, "[d]ifferent employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Id.*

1. **Plaintiff has not shown sufficient evidence that her compensation and benefits were less favorable than similarly situated male employees working outside the United States.**

Plaintiff claims that she was treated less favorably than several similarly situated employees. Regarding her first claim that she was provided less favorable compensation and benefits than male employees who performed duties outside of the United States, Plaintiff alleges that Defendant allowed male employees to reside in one location and work in another. Accordingly, she alleges that she should have been permitted to live in Belgium when all of her job responsibilities were located in Chicago. Plaintiff names several employees: Gerald Taylor, Max White, Demetrio Garcia, Mike Matthews, Sing Chang, Pete Dial, Jay Dayhoff,

16

Gary Lantner, and Tom Brown. She points out that Max White and Demetrio Garcia were permitted to reside in one location and "perform their job duties in different locations, and to be compensated in connection with the business travel necessitated by that arrangement." Pl. Mem. at 14. For instance, White performed job duties in the Atlantic Division in Europe where Plaintiff performed job duties, and Garcia performed duties in South America. Neither White nor Garcia were required to move to their respective locations. She further argues that these two employees were similarly situated to her in all material respects. Plaintiff further claims that United permitted some of these employees to work out of offices in their homes, and commute to the Chicago office. Although Plaintiff focuses on three particular male employees, each male employee addressed in her Local Rule 56.1(b)(3)(B) statement of additional facts will be discussed.

### a.    Max White

Plaintiff claims that Defendant permitted Max White to live in one country or area and commute to another to perform his duties. She claims that Max White was an employee at her level and that he was permitted to reside in the United States and work in the European Atlantic division. Defendant admits that Max White lives in the United States and performed some duties in Europe. In addition, however, he had substantial duties at the world headquarters in Chicago and throughout Europe because of his management of the Star Alliance program. Plaintiff, on the other hand, was to provide services exclusively in Chicago following her decision to return to Chicago in 2000. White can not be considered

a similarly situated employee because he had substantial job duties in Chicago and throughout Europe while Plaintiff performed duties in Chicago only.

### b. Demetrio Garcia

Plaintiff claims that Defendant permitted Demetrio Garcia, employed in the Department, to reside in one location and perform duties in another location. Garcia resided in the Chicago area near the Department's primary office and performed duties throughout Latin America. Plaintiff is not similarly situated to Garcia for the same reason she is not similarly situated to Max White: she performs all of her duties in Chicago and seeks to reside internationally, while White and Garcia both perform job duties domestically and internationally.

### c. Gerald Taylor

Plaintiff claims that Defendant permits Gerald Taylor to live in one country or area and travel to another country to perform job duties. Plaintiff also asserts that she and Taylor are considered to be employees at an equal level. Plaintiff presents no facts that indicate Taylor's international assignment is similar to her own. Nothing in Plaintiff's 56.1(b)(3)(B) statement indicates Taylor's title or position in the company, the extent of his duties, the time spent in countries other than the one in which he was living, or the distance between his residence and the country or location in which he worked. In essence, nothing indicates that his position requiring international work was similar to Plaintiff's. Thus, Taylor is not similarly situated to Plaintiff.

### d. Mike Matthews, Sing Chang, Pete Dial, and Jay Dayhoff

According to Plaintiff, Matthews, Chang, Dial, and Dayhoff were members of the Corporate Real Estate Department who were permitted to have offices in their homes and travel to the world headquarters in Chicago. Again, no evidence supports Plaintiff's claim that any one of these employees was similarly situated to her. Furthermore, Plaintiff admits that these employees had offices in the continental United States: Matthews and Dial in Florida, Chang in California, and Dayhoff in Texas. DR ¶ 157. None of these employees had home offices in Europe while being permitted to travel to the world headquarters in Chicago. Finally, these employees were not similarly situated to Plaintiff. The evidence indicates that each of these employees had his primary job responsibilities in the proximity of his home office, not at the world headquarters in Chicago. Because Plaintiff offers no evidence that these employees were similarly situated to her, this Court finds that they are not similarly situated for the purposes of this summary judgment motion.

### e. Gary Lantner

Plaintiff states that Gary Lantner was a member of the Corporate Real Estate Department and was permitted to maintain an office in his home in Texas and an office in Chicago. Furthermore, he made approximately two trips per month from Texas to the Chicago, for which Defendant reimbursed him. Plaintiff further maintains that Lantner was "at Plaintiff's level." Plaintiff offers no other facts to indicate that Lantner was similarly situated to her. She admits, however, that she "reported indirectly to Lantner" from 1992 to

19

1996. DR ¶ 6. In addition, after the reorganization of the department in January 2000, Plaintiff reported to Max White. Max White reported to Tom Brown. Tom Brown reported to Lantner, and Lantner reported to Kazzaz. These admissions indicate that Plaintiff was lower in the chain of command, and at two different times Lantner was her superior. Lantner is not similarly situated to the Plaintiff.

**f.    Tom Brown**

Plaintiff states that Tom Brown was an employee of Defendant at Plaintiff's level who was permitted to reside in one country or area and travel to another to perform job duties. Other than this statement, Plaintiff presents no facts that Brown was similarly situated to her. She does not indicate the countries in which Brown lived, his primary job responsibilities, or the location of his primary job duties. Plaintiff does admit that after the reorganization in 2000, she reported to Max White, who reported to Tom Brown. Her allegation fails because she has not shown that she is similarly situated to Brown in all material respects, and admits that at one time he was superior to her in the chain of command.

**2.    Plaintiff has not shown any evidence that similarly situated male employees were given more favorable compensation and benefits when relocating from an international assignment.**

Plaintiff alleges that one male employee, Gerald Taylor, was similarly situated to her and received more favorable relocation benefits when he relocated to Tokyo, Japan. Viewing the facts in favor of the Plaintiff, she indicates that she and Taylor were at the same level of employment, Taylor negotiated his relocation package with Kazzaz which included

20

reimbursement for his housing expenses, and that his position in Japan began before December 2001 and is scheduled to end in December 2002. Defendant admits these facts.

Unfortunately, Plaintiff has not shown that Taylor is similarly situated to her. Plaintiff indicates no facts suggesting the nature of Taylor's assignment in Japan (i.e., whether indefinite or temporary, or whether there was an expected duration and end). Furthermore, Plaintiff admits that Taylor's assignment was scheduled to end in December 2002. His assignment, unlike her indefinite one, is temporary. Plaintiff has not met her burden to show that Taylor is a similarly situated employee.

Plaintiff can not show that she was similarly situated to any male employees who were treated more favorably than she was in either respect she alleges. Thus, she can not show sufficient evidence of a genuine issue of material fact on a necessary element of her *prima facie* case. Because she can not meet her burden, Defendant is granted summary judgment on Plaintiff's discrimination count.

## B.    RETALIATION CLAIM

The Seventh Circuit articulated a new test for summary judgment motions involving retaliation claims in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002). While the bankruptcy court stay was pending in this case, this Court had been reluctant to follow the new test because the Seventh Circuit itself applied the pre-*Stone* test to post-*Stone* cases, *see, e.g., Fine v. Ryan International Airlines*, 305 F.3d 746, 751-52 (7th Cir. 2002) (applying the pre-*Stone* rules eight months after the *Stone* decision); *Wells v.*

*Unisource Worldwide, Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002) (citing the pre-*Stone* rules three months after the *Stone* decision), and the *Stone* decision presented an unresolved internal inconsistency, *see McKay v. Town & Country Cadillac*, No. 97-C-2102, 2002 WL 664024, at *23 (N.D. Ill. Apr. 23, 2002) (recognizing as inconsistent that the *Stone* test requires that a plaintiff prove retaliation with direct evidence, that is, evidence that establishes retaliation without resort to inferences from circumstantial evidence, but allows the inherently circumstantial evidence of "mere temporal proximity" between plaintiff's protected activity and the alleged retaliatory act to be a triable issue in some cases).

Within the last year, however, the Seventh Circuit has resolved these issues and has declared *Stone* to be "the governing rule [for retaliation claims] in this jurisdiction." *Rogers v. City of Chicago*, 320 F.3d 748, 755 (7th Cir. 2003) (discounting the post-*Stone* cases that applied the pre-*Stone* rules and permitting the use of both direct and circumstantial evidence in all cases). Therefore, this Court will apply to this case the new test for retaliation as set forth in *Stone* and its progeny.

A plaintiff can prove retaliation either directly or indirectly. *Stone*, 281 F.3d at 644. Under the direct method, a plaintiff may present either direct evidence or circumstantial evidence to show that she engaged in a protected activity (e.g., filing a charge of discrimination) and consequently suffered an adverse employment action. *Rogers*, 320 F.3d at 753; *Stone*, 281 F.3d at 644. Direct evidence, if believed by a fact finder, proves a fact "without reliance upon inference or presumption." *Volovsek v. Wis. Dep't of Agric., Trade*

& *Consumer Prot.*, 344 F.3d 680, 689 (7th Cir. 2003) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)). Circumstantial evidence allows a fact finder to infer retaliation. *Id.* If the plaintiff's evidence is uncontradicted, he is entitled to summary judgment, but if the evidence is contradicted, a trial is needed unless the defendant can show that he would have taken the adverse action regardless of a retaliatory motive. *Stone*, 281 F.3d at 644.

The indirect method involves an "adaptation of *McDonnell Douglas* to the retaliation context," through which the Plaintiff "need not show even an attenuated causal link." *Id.* Using this method, the Plaintiff must show that "only [she], and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [she] was performing [her] job in a satisfactory manner." *Id.* If the Defendant presents no contradictory evidence, the Plaintiff is entitled to summary judgment, but if the Defendant presents unrebutted evidence of a nondiscriminatory motive, it is entitled to summary judgment. *Id.* In any other situation, a trial is required. *Id.* If the Plaintiff attempts to proceed under the indirect method, failure to establish any element of the *prima facie* case is fatal to the Plaintiff's claim. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

This Court will analyze this case under the new standard set forth in *Stone*, addressing each of the two methods in turn. Plaintiff alleges that United retaliated against her in three ways: 1) by not giving her the same compensation and benefits it provided to similarly

23

situated male employees who worked outside of the United States; 2) by not providing her with the same compensation and benefits provided to similarly situated male employees in connection with her relocation to the United States; and 3) by terminating her employment for engaging in activity in which male employees were engaged but for which they were not terminated.

Plaintiff argues that once she came under Lantner's authority in early 2000, he began an extensive review of her expense reports in retaliation for her original complaint against him in 1996. Additionally, she alleges that Kazzaz knew this investigation into her reports was happening and that he knew the results of this investigation in early 2000. Furthermore, she argues that the dispute with Kazzaz over her expense reports in July 2000 was disingenuous because she had indicated to Kazzaz that she was asking him to characterize the personal expenses as business expenses.

Plaintiff complained about gender discrimination several times during her employment with Defendant. She complained initially to Joan Czerneda, Senior Staff Specialist of Human Resources, in 1996 regarding Gary Lantner, then to Amos Kazzaz, Vice President of Corporate Real Estate, in late 1999 regarding John Reedy, and again to Amos Kazzaz in May 2000 about his own decision regarding her relocation package. The Court will assume for the purposes of this summary judgment motion that all of these complaints are protected expression under 42 U.S.C. § 2000e-3(a). *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (leaving open whether informal complaints are considered

protected expression but citing cases from other circuits that found informal expression to be protected under the statute); *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998) (stating that the ADA protects from retaliation a complainant who has "a reasonable belief that he is opposing discrimination"); *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1014 (7th Cir. 1997) (accepting complaints to internal EEOC officer, the EEOC, and plaintiff's discussion with supervisor as protected expression).

### 1. The Direct Method

To use the direct method under *Stone*, Plaintiff must show that she engaged in protected expression and consequently suffered an adverse employment action. *Stone*, 281 F.3d at 644. Plaintiff can show that she engaged in protected expression: she complained to the head of her department twice and complained to a human resources specialist once. Furthermore, she can show an adverse employment action for at least her third claim: she was terminated. Plaintiff, however, must show that her termination was the *result* of her complaints, through either direct or circumstantial evidence. Plaintiff has not put forth direct evidence of retaliation. Therefore, this Court will explore Plaintiff's circumstantial evidence.

Plaintiff's circumstantial evidence must show that a decision maker, the person "responsible for the contested decision," acted for a prohibited reason. *Rogers*, 320 F.3d at 754. Circumstantial evidence may take the form of "suspicious timing, ambiguous statements, behavior towards other employees and so on." *Volovsek*, 344 F.3d at 689. "Mere

temporal proximity" between a complaint of discrimination and the alleged retaliatory act, however, is rarely sufficient by itself to create a triable issue. *Stone*, 281 F.3d at 644. To withstand a summary judgment motion, the strength of circumstantial evidence must be evaluated in relation to the other evidence in the case. *Dahmen v. Sheahan*, No. 97-C-1265, 2003 WL 21781894, at *3 (N.D. Ill. July 29, 2003).

In this case, Plaintiff points to evidence that she made a sex discrimination complaint against Lantner in 1996, and when she came under his authority again in 2000, he began researching her expense reports. Plaintiff also raises some evidence that Kazzaz may have been aware of the investigation into her expense reports. Furthermore, Plaintiff shows that before the dispute involving her July 2000 expense report, she clearly communicated to Kazzaz that she was seeking reimbursement for personal expenses. From these and other similar facts, Plaintiff asks the Court to draw the inference that Defendant's motive was retaliatory. An inference of retaliation based on this evidence is too tenuous, however.

The Plaintiff asks the Court to infer that Defendant's investigation into her expense report was based on an animus against her as a woman and not based upon Defendant's legitimate suspicion of Plaintiff's improper reporting, which was confirmed by the investigation. To infer retaliation, this Court would have to conclude that Defendant concocted a scheme to manipulate the dispute over reimbursement as a method of terminating her because of her gender. This Court is unwilling to take such a leap. Furthermore, the four year time span between Plaintiff's sex discrimination complaint against

Lantner is too attenuated in time to create a triable issue. Finally, whether Lantner acted with retaliatory intent is irrelevant, because he was not the decision maker in this case. Kazzaz was the decision maker in this case, and he made the decision to terminate Plaintiff's employment for two specific reasons: Plaintiff's attitude and her misrepresentation of expenses. Kazzaz gave the Plaintiff the opportunity to explain her position and counseled her before he terminated her. Therefore, Plaintiff's circumstantial evidence under the direct method does not withstand Defendant's motion for summary judgment.

### 2. The Indirect *McDonnell Douglas* Burden Shifting Method

To succeed by presenting indirect evidence of retaliation, Plaintiff must show that she alone was subject to an adverse employment action, while no other similarly situated employees who did not complain of discrimination were not subject to any adverse action. *Stone*, 281 F.3d at 644. Plaintiff also must show that she was meeting the employer's legitimate expectations at the time. *Id.* Plaintiff argues that there is no other employee in the department who complained of discrimination, thus, she was treated less favorably than all of the employees (apparently everyone in the Corporate Real Estate Department) and was the subject of retaliation. Each of the Plaintiff's claims will be discussed in turn.

### a. Plaintiff has not shown that she is similarly situated to any employee who worked outside of the United States who did not complain of discrimination.

Plaintiff alleges that, after filing her complaints, she was retaliated against by not being given the same compensation and benefits as similarly situated male employees outside

of the United States. Plaintiff must show that any similarly situated employee who did not complain of discrimination received better compensation. Plaintiff has not pointed to any similarly situated employee who did not complain of discrimination. To the extent that she makes a blanket comparison between herself and everyone in the Corporate Real Estate Department without showing specific similarly situated employees, her claim fails.

### b. Plaintiff has not shown that she is similarly situated to any employee who received a more lucrative relocation package and did not complain of discrimination.

Plaintiff further alleges that Defendant retaliated against her by not giving her the same compensation and benefits in her relocation package. To meet her burden, Plaintiff must show any similarly situated employee who did not complain about discrimination received a better relocation package. Again, Plaintiff has not pointed to any similarly situated employees in the Department. To the extent that Gerry Taylor received a more lucrative relocation package, this Court has previously determined that Plaintiff did not show that he was a similarly situated male employee. This claim fails.

### c. Plaintiff has not shown that any similarly situated employees engaged in the same conduct as she did.

Plaintiff's final allegation of retaliation is that similarly situated male employees who engaged in the same type of conduct were not subject to the same adverse employment action. This Court takes the term "conduct" to mean Plaintiff's dispute with Kazzaz over reimbursement for personal expenses. To succeed, she must show that similarly situated employees who did not complain about discrimination were not terminated for the same

conduct for which Plaintiff was terminated (i.e., belligerence and misrepresentation of her personal expenses). To support this claim, Plaintiff indicates that Max White sought and received reimbursement for more than one personal phone call per day while he was traveling on business. DR ¶ 125. Unfortunately, this assertion does not help Plaintiff's claim. There is no indication that Defendant questioned White about his expenses, that Kazzaz knew of this reimbursement, that White got into a dispute with Kazzaz or any other member of the Department regarding his expenses, that White ever misrepresented those expenses, or that White acted belligerently by asking his supervisor to deny the reimbursement request in writing. Again, Plaintiff can point to no similarly situated employees; she raises no facts indicating that any other employee was treated more favorably, despite misrepresenting phone calls and acting belligerently, but not complaining of discrimination.

Plaintiff can not show that similarly situated employees who did not complain about discrimination were treated more favorably than she because she can point to no similarly situated employees. Accordingly, Plaintiff can not succeed on her retaliation claim under this theory.

## C.  CONTRACT CLAIM

Plaintiff's third claim is that Defendant entered an oral contract to allow her to reside in Europe *permanently*, and that Defendant breached this contract when it "forced" Plaintiff to return to the United States. In addition, Plaintiff claims initially that Defendant assigned the Plaintiff to work from Belgium for three years. Defendant contends that this claim is

barred by the Statute of Frauds, or alternatively that Defendant performed the contract by allowing Plaintiff to work out of the office in Brussels for more than three years. Plaintiff responds that a letter dated May 1, 2000, signed by Kazzaz as head of the Department, and affirming that Plaintiff was "correct about [her] previous promotion and relocation," was sufficient to satisfy the Statute of Frauds. In the alternative the Plaintiff argues that Clark's letter acted as a waiver of Defendant's Statute of Frauds defense.

The parties do not dispute that Illinois law governs the contract claims in this case. The Illinois Frauds Act provides:

> No action shall be brought . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

740 Ill. Comp. Stat. 80/1. If the writing is signed by an agent of the person to be charged, the agent can sign only as authorized by the principal. *Sangston v. Ridge Country Club*, No. 93 C 0628, 1993 WL 356927, at *3 (N.D. Ill. Sept. 13, 1993). To satisfy the Statute of Frauds, "the offered writings must 'establish a meeting of the minds as to the basic details of the agreement, which is obviously necessary to constitute a binding contract.'" *Id.* at *2 (quoting *Dresser v. Pyrrhus AG*, 936 F.2d 921, 928 (7th Cir. 1991)). A party may waive its Statute of Frauds defense when there is an acknowledgment of an agreement and its subject matter. *R.J.N. Corp. v. Connelly Food Prods., Inc.*, 529 N.E.2d 1184, 1189 (Ill. App. Ct. 1988).

### 1. The May 2000 letter is insufficient to satisfy the Statute of Frauds.

The May 1, 2000, letter does not satisfy the Statute of Frauds because the portion of the alleged contract that could not be performed within one year was not in writing and signed by the party to be charged. Here, Plaintiff's email stated in part, "I have suggested and United has agreed to my relocation to and permanent residence in Brussels, Belgium." Kazzaz responded in a signed letter: "You are correct about your promotion and relocation; however, this office is being closed, and your position must be modified accordingly." Notably, Kazzaz did not write that Plaintiff was correct about her relocation *and permanent residence*. He mentions nothing of the promise from Clark that Plaintiff could remain in Belgium permanently. Kazzaz's letter does not clearly set out the terms of the 1997 oral promise. It is absent any details regarding Plaintiff's 1997 relocation and promotion agreement, and in no way indicates a meeting of the minds on this issue.

In contrast, the May 1997 letter clearly establishes a meeting of the minds. It outlines the terms of Plaintiff's promotion, including her monthly salary, benefits, start date, reimbursement for relocation, how her future salary increases would be determined, how taxes would be handled, and her responsibility for obtaining work permits. Both Clark and Czerska signed the 1997 letter, and it satisfies the Statute of Frauds. The problem is that the letter makes no mention of the permanent Belgium residence agreement. Rather, it affirms that she was an at-will employee. Thus, Plaintiff's claim fails because an oral promise does not satisfy the Statute of Frauds.

## 2. The May 2000 letter is insufficient to constitute a waiver.

Next, Plaintiff argues that the May 2000 letter is sufficient to bar Defendant's Statute of Frauds defense. The Statute of Frauds defense may be waived if the party to be charged acknowledges the agreement and its subject matter. *See McCollum v. Bennett*, 424 N.E.2d 90, 92, 98 Ill. App. 3d 80, 82 (Ill. App. Ct. 1981). This argument fails for the same reason the first argument failed. The writing signed by Kazzaz is not sufficiently clear to be an acknowledgment of the subject matter of the agreement. In *McCollum*, the defendant acknowledged the existence of a contract but consistently denied the plaintiff's meaning of the disputed phrase. *Id.* The disagreement in that case centered around whether the word "property" in the contract referred to personal or real property. *Id.* at 91. Similarly, this dispute revolves around the absence of the term for permanent residence in the written contract and what Defendant meant by any promise of permanency that it made. While before this Court, Defendant consistently has rejected Plaintiff's meaning of the word "permanent." Kazzaz's letter, which responds to other terms of the Plaintiff's agreement but says nothing about a promise of permanency, can not be considered to state the subject matter of the agreement. Therefore, this Court finds that the May 2000 letter does not constitute a waiver of the Statute of Frauds defense.

## 3. Plaintiff's at-will employment status

Finally, the May 2, 1997, letter/agreement signed by Plaintiff specifically states that "nothing in this agreement alters your status as an at-will employee." At-will employment

contracts are "terminable by either party for good reason, bad reason, or no reason at all." *Tolmie v. United Parcel Service, Inc.*, 930 F.2d 579, 580 (7th Cir. 1991). Under the language of the agreement, Defendant had the authority to terminate Plaintiff when it eliminated her position in Europe. Defendant did not terminate her; instead it offered her three options, one of which was to return to the United States. Plaintiff chose this option. Thus, Defendant did not breach the at-will employment contract.

## D.   PROMISSORY ESTOPPEL

Promissory estoppel is "a theory of law by which a person may be held liable upon a promise, for which there is no consideration." *Wagner Excello Foods, Inc. v. Fearn Int'l Inc.*, 601 N.E.2d 956, 964 (Ill. App. Ct. 1992) (quoting *Barker-Lubin Co. v. Wanous*, 167 N.E.2d 797 (Ill. App. Ct. 1960)). In order to survive summary judgment on a promissory estoppel claim, a plaintiff must show: 1) the defendant made an unambiguous promise to the plaintiff; 2) the plaintiff relied on the promise; 3) the plaintiff's reliance was expected and foreseeable by the defendant; and 4) the plaintiff relied on the promise to her detriment. *Pokora v. Warehouse Direct, Inc.*, 751 N.E.2d 1204, 1212 (Ill. App. Ct. 2001). Although a party may plead breach of contract and promissory estoppel in the alternative, once the court finds an enforceable contract between the parties and the existence of consideration, the party may not recover under the promissory estoppel theory. *Prentice v. UDC Advisory Servs., Inc.*, 648 N.E.2d 146, 150 (Ill. App. Ct. 1995).

Plaintiff can not establish the first element of promissory estoppel. Plaintiff claims that Defendant promised her permanent residence in Belgium. It appears that Plaintiff interprets "permanent residence" to mean that she would be permitted to live in Belgium as long as she was employed by Defendant, regardless of any changes in the location of her work duties, or any changes in her title with Defendant. Defendant, on the other hand, used the term to distinguish Plaintiff's assignment from assignments that are "temporary assignment[s] for a fixed period of time." DR ¶ 24. In addition, McAtee, a human resources specialist, used the term "permanent" as a term "to distinguish from assignments that are temporarily [sic] in nature with the intent that the employee is to return to their [sic] home location within some fixed period of time." DR ¶ 26. In other words, Defendant interpreted that Plaintiff's assignment was indefinite, not permanent.

The differing understandings of the parties indicates that the promise to Plaintiff was anything but unambiguous. Thus, Plaintiff can not meet the first element of her promissory estoppel claim, and the Defendant is granted summary judgment on Plaintiff's promissory estoppel claim.

## III. CONCLUSION

Plaintiff has not met her burden to show the existence of a genuine issue of material fact. There is nothing for a jury to consider. For the reasons set forth in this opinion, **Defendant's motion for summary judgment is granted on all four counts of Plaintiff's complaint and judgment is therefore entered in favor of Defendant, United Airlines, Inc., and against Plaintiff, Elizabeth Czerska, on Plaintiff's complaint.**

**SO ORDERED THIS 1ST DAY OF DECEMBER, 2003**

*Morton Denlow*

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

John James Kakacek
Kakacek & Lingner
53 West Jackson Blvd.
Suite 1032
Chicago, IL 60604-3701
(312) 922-9280

William Martin Walsh
53 West Jackson Blvd.
Suite 224
Chicago, IL 60604
(312) 362-0400

Attorneys for Plaintiff

Joel H. Kaplan
Sheldon Leigh Jeter
Seyfarth Shaw
55 East Monroe St.
Suite 4200
Chicago, IL 60603
(312) 346-8000

Attorneys for Defendant